## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MEIFANG XIANG, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| EAST TEXAS A&M UNIVERSITY, and its | § | |
| President Dr. MARK RUDIN, its Provost | § | |
| Dr. TAMMI VACHA-HAASE, and its Interim | § | |
| Dean Of the College of Business, SCOTT | § | |
| WHEELER, all in their official capacities. | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES Meifang Xiang, Plaintiff in the above-styled and numbered cause, and files her Original Complaint against Defendant East Texas A&M University, and certain of its administrators. Plaintiff would respectfully show the Court the following:

## I. THE PARTIES

1.1     Plaintiff Meifang Xiang ("Dr. Xiang" or "Plaintiff") is an individual residing in Collin County, Texas.

1.2     Defendant East Texas A&M University ("Defendant" or "ETAMU" or "the University") is an arm or instrumentality of the State of Texas, and is a public university organized under the laws of the State of Texas, located in Commerce, Hunt County, Texas. Defendant may be served by serving Dr. Mark Rudin in his capacity as President of TAMU, Office of the President, McDowell Business Administration Room 295A, East Texas A&M University, 2600 W. Neal St., Commerce, Texas 75428.

1.3     Dr. Mark Rudin ("Rudin" or "President Rudin") is an individual with his place of business in Hunt County, Texas. He may be served in his capacity as President of TAMU, Office of the President, McDowell Business Administration Room 295A, East Texas A&M University, 2600 W. Neal St., Commerce, Texas 75428.

1.4     Provost Tammi Vacha-Haase (the "Provost" or "Provost Vacha-Hasse") is an individual with her place of business in Hunt County, Texas. She may be served in her capacity as Provost and Vice-President for Academic Affairs at the Office of the Provost and Academic Affairs, McDowell Administration Building, Room 280, East Texas A&M University, 2600 W. Neal St., Commerce, Texas 75428.

1.5     Interim Dean Scott Wheeler ("Interim Dean") is an individual with his place of business in Hunt County, Texas. He may be served in his capacity as Interim Dean of the College of Business, 2600 W. Neal St., Commerce, Texas 75428.

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because one or more of Plaintiff's causes of action is created by federal law, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

2.2     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Hunt County, Texas, which is within this district and division.

## III.  FACTUAL BACKGROUND

### OVERVIEW – DEPRIVATION OF DUE PROCESS, AND TITLE VII DISCRIMINATION

3.1     Plaintiff is a tenured Associate Professor of Accounting at East Texas A&M University (formerly Texas A&M University–Commerce). ETAMU purported to "summarily

dismiss" Plaintiff, effective March 25, 2025. After Plaintiff's counsel repeatedly informed ETAMU that the university and its administrators had failed to follow the institution's own policies and procedural due process guaranties, it backtracked, but still has failed to afford Plaintiff the due process to which she is entitled before termination. Note that "summary dismissal" and "dismissal for cause" have distinct meanings under ETAMU's policies, and the procedures, including the due process afforded to faculty, are very different depending which form of termination the school pursues.

3.2    ETAMU, once it realized that it had not properly "summarily dismissed" Plaintiff, issued a "replacement" for its March 25, 2025. letter of summary dismissal, as follows:



May 7, 2025  (This letter replaces the previous letter of March 25, 2025)

Dr. Meifang Xiang
140 Horseshoe Bend
Fairview, Texas 75069

RE: Notice of Termination for Cause

Dear Dr. Xiang,

You were previously presented a Notice of Intent to Dismiss on February 12, 2025. On March 25, 2025, you received a letter summarily dismissing your employment.  The letter summarily dismissing your employment is hereby withdrawn and replaced with this Notice of Termination for Cause. This Notice of Termination for Cause terminates your employment with East Texas A&M University – Commerce, Accounting & Finance Department, as Associate Professor.

Thus, TAMU purported to "undo" the summary dismissal, and told Plaintiff that instead this was her "notice of termination for cause." On May 28, 2025, ETAMU notified Plaintiff, through a benefits representative in its Human Resources department that, "Your termination was rescinded and in doing so your benefits were reinstated. You continue to receive your elected coverages until any further action is taken."

3.3    On May 30, 2025, that "further action" was taken. The Provost wrote to Plaintiff, stating that her "dismissal and relinquishment of tenure is effective May 31, 2025." According to the Provost, Dr. Xiang was not entitled to a due process hearing regarding her termination "for cause," which the policies and the Constitution guarantee.  ETAMU's basis for refusing Plaintiff a hearing, now that it had withdrawn and replaced the "summary dismissal" letter, was that *before ETAMU withdrew the summary dismissal,* her counsel had notified ETAMU that the scheduled hearing was too late, since Plaintiff had already been improperly terminated (cut off from access to university systems, benefits discontinued, pay stopped).  Only after that notice that Plaintiff would not participate in a hearing following her improper termination, did ETAMU issue its correction letter, and then rewrite history to pretend Plaintiff had declined an actual due process hearing. Instead, it surreptitiously reinstated Plaintiff and then terminated her again two days later. Pursuant to ETAMU's policies, Plaintiff remains employed until the university shows good cause for her dismissal.

3.4    The entire lead up to ETAMU's bungled attempt to terminate Plaintiff was characterized by discriminatory decisions by her department chair (now removed from such position) and others. Plaintiff received less favorable treatment based on her race (Asian), ethnicity and national origin (Chinese, with an accent), and sex (female). On April 30, 2025, Plaintiff filed a charge with the EEOC, alleging discrimination based on her race, sex, national origin (including ethnicity and accent), and for retaliation. She received her notice of right to sue on May 20, 2025. Having exhausted her administrative remedies, she timely files this lawsuit.

**DR. XIANG'S UNDISPUTED CREDENTIALS**

3.5    Dr. Xiang was hired by ETAMU's College of Business in 2019, and began teaching graduate level accounting courses. At the time she came to ETAMU, she had been a tenured

Professor of Accounting for over 10 years, had a CPA license in both the United States and China, had worked in the accounting field and industry (including Fortune 500 companies), published numerous peer-reviewed articles in well-respected journals dealing with accounting issues, and had completed over 25 credits of graduate-level accounting courses. Dr. Xiang earned her Ph.D. from Purdue University in economics, which involved conducting accounting-related research. She earned tenure as an accounting professor at the University of Wisconsin, Whitewater, where she won teaching awards, and continued to build a foundation of accounting education, including CPA certification. Altogether, she taught and published in accounting for fifteen years before her qualifications and performance were questioned by ETAMU.

### AFTER FOUR YEARS AT ETAMU, INITIAL ACCREDITATION ISSUES ARISE

3.6     On or about June 20, 2023, Plaintiff received a letter from Senior Vice Provost Dr. Ricky Dobbs ("Dobbs"), informing her that she lacked the doctoral-level accounting courses in her academic background necessary to continue teaching graduate level accounting courses. Dobbs, who is also ETAMU's accreditation liaison, claimed that the deficiencies in Dr. Xiang's academic background put the university out of compliance with the requirements of its accrediting agency, SACSCOC (Southern Association of Colleges and Schools Commission on Colleges), and specifically Principle 6.2.

3.7     At this point, Dr. Xiang had been an accounting professor at ETAMU for four years, always teaching graduate-level accounting courses, and had taught for ten years at UWW before that. Dobbs' claims made no sense to her. She contacted her then-Department Head Dr. Michael Oparah ("Oparah"), who was also confused. Dr. Xiang put together documentation of her qualifications for teaching accounting graduate courses, and submitted it to Oparah.

3.8    Dr. Xiang met with Dobbs on June 30, 2023, to discuss the documents she had submitted to Oparah. Dobbs told her that based on the information she had submitted, she should "be fine." Dobbs told her that others, including department heads, had found themselves in the same situation.

3.9    A committee from SACSCOC was scheduled to come to ETAMU for an on-site visit during March of 2024. In preparation for the on-site visit, DR. XIANG worked to reassure ETAMU that her academic qualifications for teaching graduate-level courses in accounting were adequately demonstrated. She submitted a package of documents to both Dobbs and Dr. Atinc Guclu ("Guclu"), Associate Dean and Professor of Management, explaining how her academic degrees, background, and experience easily qualified her as an accounting professor capable of teaching graduate-level courses in accounting. Based on the documentation Dr. Xiang provided to Dobbs and Guclu, the university should easily have been able to meet the requirements of SACSCOC Principal 6.2.

3.10    Also on March 26, 2024, Guclu sent a letter to Dobbs, explaining that he and the accounting department reviewed her portfolio and had qualified Plaintiff as a "Scholastic Academic ("SA") to the College of Business's accrediting agency, the Association to Advance Collegiate Schools of Business ("AACSB"). Guclu's letter noted her extensive academic qualifications and experiences related to accounting, and concluded "*we consider Dr. Xiang as a faculty member who is qualified to teach both undergraduate and graduate level accounting courses*."

3.11    Despite the foregoing, ETAMU did not contact SACSCOC to correct the error, or request reconsideration. Instead, the Provost's office leaned into the mischaracterizations of Plaintiff's qualifications.

3.12    On April 16, 2024, ETAMU issued Plaintiff's 2024-2025 contract, again appointing her a tenured Associate Professor of Accounting in its College of Business. The next month, however, Dobbs emailed the new department head, Dr. Caroline Hartmann ("Hartmann"), claiming that the on-site SACSCOC visiting team had made a recommendation that Dr. Xiang was not qualified to teach graduate-level accounting courses, and therefore she would not be permitted to teach graduate-level accounting courses beginning the Fall, 2024, semester. (This is contrary to SACSCOC's position, as set forth on its website, that "*SACSCOC neither evaluates individuals, résumés, or transcripts, nor does it certify individuals*.")

3.13    Dobbs went further, stating that her eligibility as a graduate-level faculty member in the accounting department was in question pursuant to local policies. He went on to say Dr. Xiang could remedy the situation by completing an additional 18 credits of graduate-level accounting courses at the "doctoral level." Two days later, Interim Dean Wheeler ("Wheeler") removed the fall semester graduate classes Dr. Xiang was already assigned to teach from her schedule, assigning them to another professor. A few days later, Wheeler confirmed that the decision regarding Dr. Xiang's status came from the Provost's office.

**D<small>R</small>. X<small>IANG</small> C<small>HALLENGES THE</small> D<small>ECISION TO</small> D<small>OWNGRADE HER</small> Q<small>UALIFICATIONS</small>**

3.14    At this point, Dr. Xiang requested from Dobbs the documents he had sent to SACSCOC and the documentation of SACSCOC's recommendation regarding her credentials. He did not reply, so Dr. Xiang followed up with both Dobbs and Dean Wheeler, reiterating her request, and explaining that SACSCOC, according to its website, does not specifically address individual faculty qualifications, but rather the qualifications of the institution's faculty as a whole. Further, the requirement on the website for graduate instructors was "*Faculty teaching graduate and post-*

*baccalaureate course work: earned doctorate/terminal degree in the teaching discipline or a related discipline.*" As ETAMU knows, Dr. Xiang meets this criterion.

3.15    SACSCOC requires a terminal degree in the teaching discipline *or a related discipline*, and requires *18 graduate semester hours in the teaching discipline*. Plaintiff met both criteria. Despite Dobbs' claim, SACSCOC does not specify those 18 graduate hours must be at the "doctoral level." Dobbs emailed Plaintiff, reiterating his claim that SACSCOC found her qualifications to be insufficient. He provided a document from the SACSCOC visiting team entitled "*Justifying and Documenting Qualifications for Faculty.*" On that document, Plaintiff's terminal degree was incorrectly described, and the document falsely stated she held no United States CPA certification.

3.16    Dr. Xiang contacted SACSOC about the issue, and spoke with one of the agency's vice presidents, Denise Young ("Young"). On May 30, 2024, Dr. Xiang emailed Provost Vacha-Haase, letting her know she had contacted SACSCOC in an effort to get hold of the recommendation by the visiting team that Dobbs referred to. The Provost replied to her email, warning, "*you might want to take a step back.*"

3.17    Dr. Xiang attempted to clarify to Vacha-Haase the discrepancies between what Dobbs had represented to SACSCOC and what her qualifications actually are. She detailed the mistaken information submitted, including that Dr. Xiang had not completed any graduate level courses that would qualify her to teach graduate courses in accounting, whereas Dr. Xiang has more than 25 graduate credit hours in accounting courses. She also explained to Vacha-Haase that Dobbs told SACSCOC her Master's degree was in Finance and Economics, failing to indicate that it is specifically in *International Accounting*. Dr. Xiang also clarified that her Ph.D. is in the area of consumer economics (and thus is a "related field" to accounting, as SACSCOC requires).

Additionally, Dr. Xiang corrected Dobbs' contention that she did not have a CPA license. In fact, as Dr. Xiang explained to the provost, she does have a CPA license in the United States, but it was in non-active status, as is common for accounting professors, because Dr. Xiang was exclusively teaching and conducting research at the university.

3.18    On August 2, 2024, with the final SACSCOC visit occurring that month, Dr. Xiang updated Dobbs and again contacted Young again at SACSCOC, letting her know that she had updated information regarding her qualifications. Young informed Plaintiff that SACSCOC could only receive information through Dobbs as the institution's SACSCOC liaison. Dobbs emailed Dr. Xiang to say he had talked to Young, but that he would not be reversing his decision regarding her ability to teach graduate-level accounting classes. As before, Dobbs stated the decision was based on her Ph.D. not being specifically in accounting, and that her graduate-level accounting courses were not at the "doctoral level." Plaintiff informed Dobbs and Provost Vacha-Haase that she was being treated less favorably than similarly situated faculty, to no avail.

### ETAMU CONTINUES TO SLIGHT PLAINTIFF AND TO IGNORE HER COMPLAINTS

3.19    On or about September 23, 2024, Department Head Hartmann emailed Plaintiff, informing Plaintiff she was changing her Spring, 2025, teaching schedule to benefit a non-tenure-track Instructor, Matt Cremeans ("Cremeans"), who is a White, U.S.-born male. Her rationale was she did not want to give Cremeans three course "preps," stating "*This will also help Matt so he doesn't have to teach 3 different preps in Spring*." Yet, in doing so, Hartmann gave Plaintiff three course preps, despite her being a tenured, Associate Professor, while Cremeans was a non-tenure-track Instructor. When Dr. Xiang complained that academic rank was not being considered in her decision, Hartmann discounted that rank should have any bearing on scheduling, despite that having always been the practice at the university and as is standard practice across academia.

3.20    After multiple weeks went by with Dobbs continuing to ignore her emails, Dr. Xiang reached out to him again on September 24, 2024, providing him documentation showing she had renewed her Indiana CPA license, rendering it in active status once again. Dobbs replied to that email the same day, admitting that she was correct in having stated in her earlier email that the university had not treated Plaintiff fairly. Dobbs also recognized he had told Plaintiff, back in May of 2023, there were many faculty with whom he had requested additional supporting documentation for qualifications, and that a terminal degree in a related field might qualify faculty members to teach graduate-level courses.

3.21    Although Dobbs admitted the truth of what Plaintiff had said, he also revealed that he had recommended to the Provost and President Rudin that Plaintiff's case not be appealed to the SACSCOC Board:

> *"While the University had the option of continuing to appeal your qualifications before the SACSCOC Board of Trustees, I counseled against this course of action because this risked the University being found non-compliant by SACSCOC Board, which would have subjected the University to possible sanction."*

The President and Provost agreed with Dobbs to not pursue providing corrected information about her qualifications to SACSOC. In an attempt to cut off any further grievances by Plaintiff over the issue, Dobbs concluded his email with "*I am sorry, but this is the final word on this matter.*"

3.22    On October 22, 2024, DR. XIANG submitted a formal grievance report to the Texas A&M system, complaining about Dobbs and indicating he intentionally misrepresented her academic qualifications to SACSCOC in a purposeful attempt to block Plaintiff from teaching graduate accounting courses, despite her having CPA licenses in both United States in China, despite her 15 years of experience successfully teaching graduate accounting courses, including

advanced accounting for over a decade, and despite her being well-published in accounting and finance topics.

3.23    Also in her system grievance, under the heading "*Unequal Treatment and Discrimination Issue*," Dr. Xiang included Dobbs' explanation to Plaintiff that there were others in her situation regarding qualifications to teach graduate classes. Unlike Plaintiff, one or more of those faculty possessed online, non-US doctorates. Dr. Xiang was given disparate treatment regarding the stringency of demands for demonstrating qualifications to teach graduate level courses, with Dobbs telling Plaintiff that others were not being prohibited from teaching their courses or being required to take additional courses, and that for Plaintiff, it was just "*bad luck*" that she was being singled out by the SACSCOC visiting committee. Dr. Xiang provided the details of the situation, including Dobbs telling Plaintiff he could not appeal her qualifications because she was being subjected to possible sanction by the university. Dr. Xiang concluded her system grievance report reiterating that she had been treated unfairly and unequally as other similarly situated faculty, and on account of that unequal treatment, she would not "*let this drop*" and would pursue all avenues needed to ensure her equal treatment.

3.24    ETAMU's reactions to Plaintiff simply defending herself and attempting to find the right path to correct the false information provided to SACSCOC had led the Provost to tell her to "take a step back" and Dobbs talking in circles and making decisions which contradicted what he admitted to Plaintiff. It was clear to Plaintiff that ETAMU desired to keep Plaintiff, as an Asian, Chinese woman, quiet and submissive. Speaking up for herself further led to even worse consequences. In November 2024 she was issued a first letter of "Written Warning" by Human Resources ("HR"). The Warning Letter's stated purpose was to "*bring to [her] attention new or ongoing deficiencies in [her] conduct and/or performance*." The letter indicated it would be added

to her departmental personnel file. Evidently, Plaintiff's "*emails, dated November ,1 2024, contained language and statements that do not meet the standards of respectful, civil, and collegial communication as required by the Texas A&M University System Ethical Conduct Policy (Policy 07.01). Additionally, a pattern of disregarding instructions from department leadership has been noted.*" Evidently using the words "bully" and "garbage" were considered "*uncivil and unusual language.*" The letter continued in the same vein, faulting Plaintiff for disagreeing with her department leadership.

3.25    Dr. Xiang asked HR to withdraw the letter, and the Director of HR requested to meet with her to address her concerns surrounding the warning letter. They met in December 2024, but on December 23, 2024, Plaintiff received a Letter of Reprimand claiming Plaintiff had "*disobey[ed] directives given to [her] concerning professionalism in email communication and insubordination.*" In the Letter of Reprimand, Hartmann threatened Plaintiff's employment, warning "*these incidents are a breach of your expected and entrusted role as a professional faculty member and Associate Professor. The severity of your actions justifies the disciplinary action that could lead to employment termination.*" The letter condemned Plaintiff for having dared to question the Department Head's authority to issue the November 18, 2024, Warning Letter, having questioned the amount Dr. Xiang received in merit pay, and her removal from the Teaching Effectiveness Committee. The letter admonished Plaintiff for having copied 16 departmental colleagues on the communication, and declared Dr. Xiang would be denied any merit pay the following year on account of her supposed unprofessional and insubordinate actions.

3.26    The same day, Dr. Xiang responded to Hartmann, rejecting the allegations in her Letter of Reprimand, and emphasizing that despite Plaintiff's many requests, Hartmann had yet to provide Plaintiff a clear explanation as to how her emails constituted the unprofessional and

unethical conduct and policy violation alleged in the November 18, 2024, Warning Letter. Dr. Xiang also relayed her dismay over her unfair treatment to Provost Vacha-Haase and President Rudin, complaining that instead of having received the requested meaningful feedback and resolution to her concerns following the Warning Letter, Dr. Xiang instead was now issued a Letter of Reprimand. It was very clear to Plaintiff that she was being disciplined simply for refusing to be the quiet, submissive Chinese woman the university demanded she be.

3.27    During her January 24, 2025, annual performance evaluation meeting with Hartmann and Thompson, Dr. Xiang emphasized her concern over the retaliation and discrimination she had been subjected to, including her being stripped of any merit increase for the following academic year and the other unfounded changes in her status, based on false information, and thin-skinned supervisors. Hartmann excoriated Plaintiff in her written performance evaluation, giving Plaintiff an average score of 1.3 out of 4. Dr. Xiang had always received excellent evaluations prior to Hartmann, including the prior evaluation from Oparah for the 2023-2024 academic year, in which Dr. Xiang received an overall score of 4 out of 4.

3.28    Having now gone through the motions, in quick succession, of issuing Plaintiff a Warning Letter, a Letter of Reprimand, and conducting an annual performance evaluation, ETAMU moved forward with terminating Plaintiff. On February 12, 2025, Hartmann issued Plaintiff a Notice of Intent to Dismiss. In the notice, Hartmann explained she was recommending Plaintiff for dismissal under Texas "*A&M system Policy 12.01 (4.3a, b, & g), 12.01(08) and in accordance with 07.01 Ethics.*" The notice further explained the recommendation for dismissal was "*based upon issues related to your job performance, the ruling from SACSCOC that you're not qualified to teach graduate courses, unprofessional conduct, disrespectful communication,*

*insubordination and unsatisfactory performance evaluation.*" The notice was copied to Dobbs, Vacha-Haase, Thompson, and President Rudin. Nowhere was "summary dismissal" mentioned.

3.29    DR. Xiang formally grieved the Notice of Intent to Dismiss the following day. In her grievance, which was copied, among others, to the Provost and President, Dr. Xiang requested to know why she was so rapidly and repeatedly penalized without ever having her concerns addressed. Dr. Xiang repeated her earlier contention that she had received disparate treatment, and pointed out that the allegations against her were inappropriately vague.  Dr. Xiang cited the rapid and repeated disciplinary letters and meetings with HR, the ridiculously low annual performance evaluation score she was given, and the final and abrupt issuance of the Notice of Intent to Dismiss.

3.30    The same day, Dr. Xiang was put on paid suspension, informed that she would no longer be able to teach her active courses, and cut off from her university email and other online platforms. Dr. Xiang requested to appeal to the Provost, and on February 19, 2025, Provost Vacha-Haase confirmed that Dr. Xiang would be able to meet with her for a "Meeting to Be Heard," but that only "new" information would be permitted to be discussed at that meeting. The same day, Dr. Xiang received a letter at her home address from Logan Taylor, Accounts Payable Supervisor and Property Manager, stating she was required to turn in her office and suite keys, as well as her university laptop, as soon as possible.

3.31    Dr. Xiang was never provided any procedural due process showing good cause for dismissal, prior to her termination, despite her status as a tenured professor, and despite such due process being required by university and university system policies, and also by State statute (*See* Texas Education Code 51.942, providing dismissal of a tenured professor requires a show of good cause through due process). ETAMU not only denied Plaintiff her due process rights required by policy and law, but also violated its own system policy when Hartmann issued Plaintiff her

unsatisfactory rating. Texas A&M University System Policy 12.01(3.5) requires if a tenured faculty member receives an unsatisfactory rating in any one evaluation category, the university is required to provide the faculty member a written short term development plan for improvement:

"*An unsatisfactory rating in any one area (e.g., teaching effectiveness, research, creative activities and other scholarly endeavors, or service) requires the implementation of a written short-term development plan for the faculty member, including performance improvement benchmarks.*"

No such development plan was ever provided to her; she was simply issued an unsatisfactory rating, given a Warning Letter and Letter of Reprimand, denied any real explanation as to how her conduct violated policy, given a Notice of Intent to Dismiss, and put on paid suspension, without any form of due process.

3.32    Dr. Xiang's attorney reached out to the university on February 20, 2025, demanding that Dr. Xiang receive a full due process hearing over the Notice of Intent to Dismiss. There was no response. On February 24, 2025, Provost Vacha-Haase verified to Plaintiff that she had received her attorney's letter, but would be moving forward with the "Meeting to Be Heard."

3.33    The "Meeting to Be Heard" with the Provost and a university system attorney took place on March 21, 2025. Dr. Xiang was accompanied by a representative from the Office of Faculty Representation of the Texas AAUP-AFT. During the meeting, Vacha-Haase and the university system attorney maintained their position that her union representative could not speak or advocate on her behalf, and could only advise Plaintiff. Nonetheless, her AAUP representative did advocate on her behalf at her request as needed, citing case law as to why she should be permitted to speak on her behalf, considering the proceeding was intended to be a unilateral grievance hearing. During the meeting, the Provost and her university system attorney were

accusatory toward Plaintiff, despite the purported purpose of the meeting being for Plaintiff to be heard. Additionally, Provost Vacha-Haase repeatedly attempted to end the meeting early, despite it having been scheduled for a full hour. Each time she attempted to end the meeting early, Dr. Xiang's representative stepped in to explain that Dr. Xiang was entitled to the full scheduled time and that Dr. Xiang was not finished airing her grievance.

3.34     Dr. Xiang reiterated that her termination and maltreatment by the university was on account of her national origin, race, and ethnicity, and sex, and that she was in the process of filing a Title VII charge with the EEOC. The university system attorney confirmed she was aware of her pending Title VII charge.

3.35     It was obvious from the outset and during the meeting the university had no intention of reversing its decision about her employment, no matter what information Dr. Xiang provided. The Provost took no meaningful time to consider her input during the meeting, and took just until the next business day, on March 24, 2025, to issue an email denying her appeal.

**INJURY TO PLAINTIFF**

3.36     On the basis of her Asian race, Chinese ethnicity, accent, and national origin, and her female sex, ETAMU discriminated and retaliated against Plaintiff, mistakenly representing her credentials to the SACSCOC accrediting agency, and refusing to provide corrected information; depriving Plaintiff of teaching courses she is qualified to teach; declaring its intent to deprive Plaintiff of future merit pay; harassing Plaintiff through disciplinary letters and meetings without meaningfully addressing her questions and grievances; and reprimanding Plaintiff for being critical of administrators who took these actions.

3.37     In addition, ETAMU's denial of due process to Plaintiff, as required by its own policies and the Fourteenth Amendment, is further evidence of discriminatory intent. ETAMU

terminated Plaintiff's tenured employment summarily without adhering to its policies, stating its decision in a mish mash that Plaintiff initially attempted to appeal, in good faith, in the expectation that ETAMU would realize that at best it had asserted grounds for "for cause" rather than "summary" dismissal. When it became clear that she had already been *summarily terminated*, there was no point in participating in a due process hearing, which was, according to ETAMU's policies, a requirement prior to termination *for cause*. After Plaintiff's counsel had explained this to ETAMU, that if she was already terminated, she would not participate in the scheduled "hearing" (which ETAMU had already refused to reschedule, despite Plaintiff's counsel's previously schedule trip out of the country).

3.38    Five days after Plaintiff's counsel declined the post-termination hearing, Defendant issued its new letter, saying that instead of being summarily terminated, Plaintiff was being notified of a termination for cause. No hearing was offered, and two days after Plaintiff learned that she had been reinstated, she received notice that she was terminated again.

3.39    Plaintiff has suffered loss of her income and her reputation and her tenured employment, based on discrimination against her as an Asian woman of Chinese origin, with a noticeable accent (i.e., on the basis of race, ethnicity, accent, national origin, and sex), and/or in retaliation for her previous complaints of disparate treatment and her filing an EEOC charge. Such actions caused harm to Plaintiff in the form of actual monetary damages, life-threatening mental and physical anguish, and infringement on her civil and constitutional rights, in violation of the Civil Rights Act of 1964 and the Fourteenth Amendment.

## IV. <u>CAUSES OF ACTION</u>

4.1    ***Alternative Pleadings***.  To the extent necessary, each of the claims set forth below is pleaded in the alternative, and all allegations contained in each count below are incorporated

into each other count by this reference. Further, to the extent necessary, all allegations set forth above in Section III. Factual Background (paragraphs 3.1 through 3.39) of this Complaint are hereby referenced and fully incorporated in each of the claims below by this specific reference, as though set forth in full.

**Count 1:    Violation of the 14th Amendment Brought Pursuant to 42 U.S.C. § 1983 – Deprivation of Property Interest without Procedural Due Process**

*(Against the Administrator Defendants in their Official Capacities)*

4.2    Plaintiff brings this claim under 42 U.S.C. § 1983, against Defendants President Rudin, Provost Vacha-Haase, and Interim Dean Wheeler, in their official capacities, seeking prospective and injunctive relief. As employees and administrators of a public university, these defendants (the "Administrator Defendants") are state actors subject to § 1983 liability. The Eleventh Amendment may shield the university itself from claims under § 1983, but claims against individual administrators in their official capacities, for prospective or injunctive relief, to halt ongoing Constitutional violations, is permitted. *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)). Plaintiff seeks such relief for violations of her Constitutional rights under the Fourteenth Amendment.

4.3    The Administrator Defendants, or their predecessors in their official roles, enacted the deprivation of Plaintiff's due process; moreover, these administrators have the authority to take corrective action, if mandated by this Court. The termination of Plaintiff, whether or not motivated by discriminatory or retaliatory animus, deprived Plaintiff of her property interest in her tenured employment without due process. This deprivation was a result of the policies of ETAMU, as written and/or as applied to Plaintiff.  Additionally, all of the wrongful conduct described herein was caused by policymakers of ETAMU, or was sanctioned, through action and/or inaction, by ETAMU's policymakers.

4.4.    As set forth above, ETAMU and its administrators deprived and/or improperly diminished Plaintiff's right to procedural due process, as secured by Fourteenth Amendment to the United States Constitution.

4.5.    Defendants violated Plaintiff's right to procedural due process by misapplying ETAMU's policies regarding termination of tenured faculty. First, the process began under the provisions for "for cause" termination, under which ETAMU's policies guarantee continued employment until a due process hearing has found cause for termination. But partway through the process, ETAMU issued a letter summarily terminating Plaintiff.



**EAST TEXAS A&M**
U N I V E R S I T Y

March 25, 2025

Dr. Meifang Xiang
140 Horseshoe Bend
Fairview, Texas 75069

RE: Notice of Summary Dismissal

Dear Dr. Xiang,

This letter is to inform you of my decision to uphold the termination of your employment with East Texas A&M University – Commerce, Accounting & Finance Department, from your position as Associate Professor. You were previously presented a Notice of Intent to Dismiss on February 12, 2025. All university property should be returned as soon as possible to the Accounting Department.

This decision is based upon issues related to your job performance, the ruling from SACS that you are not qualified to teach graduate courses, unprofessional conduct, disrespectful communication, insubordination and unsatisfactory performance evaluation. These instances are in violation of System Policies 07.01 Ethics, 12.01(4.3 a & b), 12.01(08) and ETAMU Procedure 12.01.99.R1 Academic Freedom and Responsibility.

In addition to the issuance of the Intent to Terminate, you were notified that you have ten (10) business days to exercise the opportunity to be heard by Dr. Tammi Vacha-Haase, Provost. You met with Dr. Tammi Vacha-Haase, Provost, on March 21, 2025. Dr. Vacha-Haase notified you of her decision to uphold the Intent to Dismiss on March 24, 2025 via email. Based on Dr. Vacha-Haase's decision, I am summarily dismissing you from your employment.

4.6     Plaintiff proceeded to request an appeal, meanwhile informing ETAMU, through counsel, that the procedures for Summary Dismissal had not been met. Efforts to demonstrate the procedural infirmities fell on deaf ears. However, ETAMU set its hearing process in motion, an despite policies stating that the hearing committee would work with the faculty member and her counsel, Plaintiff received a take-it-or-leave-it June 2, 2025, date for a hearing, when her counsel would be out of the country. Realizing that Plaintiff had already been terminated, as of late March, with no due process or efforts to correct the policy breaches, her counsel informed ETAMU's counsel on May 2, 2025, that they would not participate in the June 2 hearing.

4.7     As set forth above, ETAMU then reversed course, sent a different letter on May 7, withdrawing the summary termination and evidently reinstating Plaintiff, but without notice that she now must appeal again and request a hearing. On the contrary, the new letter said Plaintiff had already appealed, and that the hearing committee would be in touch. At that point, the hearing committee had been in touch ten days earlier, and Plaintiff had declined the hearing *at a point in time when she had already been terminated.* She was not contacted by the committee about a due process hearing based on the May 7, 2025 letter. She never had the opportunity for the actual, due process hearing in which ETAMU would have to show cause for terminating her. She still has not been afforded such opportunity.

4.8     Defendants' actions deprived Plaintiff of her property interest in her employment and her tenure.  Additionally or alternatively, Defendants violated Plaintiff's right to procedural due process by failing and/or refusing to provide Plaintiff with a full due process hearing prior to her termination, depriving and/or improperly diminishing: (1) Plaintiff's protected property interest in her ongoing employment as a tenured faculty member; (2) Plaintiff's protected property interest in ETAMU's policies and procedures and those of the Texas A&M System.  Defendants

impinged, deprived, and/or improperly diminished all of Plaintiff's foregoing protected interest and freedoms without due process of law.

4.9.    Additionally or alternatively, Defendants violated Plaintiff's right to procedural due process by preventing her any meaningful opportunity to be heard. Defendants failed and/or refused to provide Plaintiff with the minimal procedural due process and/or the procedural redress system incorporated into ETAMU's policies, procedures, guidelines, rules, and/or regulations, and those of the Texas A&M System, effectively denying Plaintiff the due process rights to which she was entitled, thus, violating her right to procedural due process guaranteed by the United States Constitution.

4.10.    Defendants' conduct constitutes violations of Plaintiff's rights to procedural due process.    As a result of Defendants' conduct, Plaintiff has been injured and/or damaged. Plaintiff seeks injunctive and prospective relief against the Administrator Defendants, in their official capacities, because they are the administrators who either committed or enforced the violation of her rights under federal law, and who have the power and authority to give effect to the relief sought. *See, e.g., Haverkamp v. Linthicum,* 6 F.4th 662, 670 (5th Cir. 2021). The relief Plaintiff seeks includes reinstatement of her employment, and sealing the unfounded and disparaging evaluations and disciplinary actions against her. "[A] request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception to Eleventh Amendment immunity, as it is a claim for prospective relief designed to end a continuing violation of federal law." *Nelson v. Univ. of Tex.*, 535 F.3d 318, 324 (5th Cir. 2008).

**Count 2:**     **Discrimination and Retaliation Based on Race, Sex and Race Under Title VII of the Civil Rights Act of 1964**

*(Against ETAMU)*

4.11     Title VII, 42 U.S.C. §2000e, *et seq*., prohibits employers, including public universities, from discrimination based on race, color, sex, religion, or national origin "with respect to [an employee's] compensation, terms, conditions, or privileges of employment." Specifically, Title VII bars employers from imposing unequal terms in hiring, promotion, pay, or other employment conditions based on those protected characteristics, and safeguards employees from retaliation for engaging in protected activities.

4.12     Incorporating all preceding paragraphs of this Complaint, Defendant discriminated against Plaintiff, refusing to correct its own errors in reporting to SACSCOC and thereby denying Plaintiff courses she was qualified to teach. Worse, ETAMU, through Dobbs, admitted that others were treated more favorably than Plaintiff, but when Plaintiff complained of these actions, she was subject to either further discrimination, or retaliation for her repeated complaint that she had been discriminated against.

4.13     The actions and decisions set forth above include adverse employment decisions taken against Plaintiff based on her race, ethnicity, national origin, and sex. She was disciplined for simply expressing her opinions, and for seeking justice for the unwarranted downgrading of her qualifications. She was ultimately terminated for advocating on her own behalf, instead of conforming to a stereotype of a meek and subservient Asian woman.

4.14     In April 2025, Plaintiff submitted an EEOC charge under Title VII, which was assigned EEOC Number 450-2025-07125. On May 20, 2025, Plaintiff received notice of her right to sue. Plaintiff has exhausted her administrative remedies and timely files this action for all relief

to which she may be entitled as a result of Defendant's violations of Title VII, including economic damage, pain and suffering, mental and physical anguish, and attorney's fees.

## V.  <u>REQUESTED RELIEF</u>

5.1    As the direct and/or proximate result of Defendant ETAMU's actions complained of herein, Plaintiff has been damaged and seeks recovery of the full measure of relief and damages against the university for violations of Title VII, including economic damages, compensatory damages, equitable relief, attorney's fees, and costs. She also seeks prospective and injunctive relief against the Administrator Defendants, including reinstatement, all due process she is owed, and sealing of the disparaging contents of her personnel file, including the disciplinary records and final evaluation, and for attorney's fees as may be permitted, and all other relief to which she may be entitled.

## VI.  <u>FEES, COSTS, AND INTEREST</u>

6.1      Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent her in connection with this matter, and has agreed to pay the law firm its reasonable and necessary attorneys' fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiff seeks to recover her reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law or in equity, specifically including 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988.

6.1      Plaintiff is also entitled to and seeks to recover costs of court, expert witness fees, and pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  <u>CONDITIONS PRECEDENT</u>

7.1      All conditions precedent to the Plaintiff's recovery on the claims alleged herein have been performed or have occurred.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

8.1        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests

a jury trial and has tendered, or will tender, the requisite fee.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that upon final

trial, Plaintiff recover judgment against Defendants and be awarded:

(a)        Against ETAMU, any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendant (as set forth above more specifically), including both actual and nominal damages;

(b)        Against Defendants President Rudin, Provost Vacha-Haase, and Interim Dean Wheeler, in their official capacities, prospective and injunctive relief requiring that Plaintiff be reinstated, that her disciplinary records be sealed, that her final performance review be sealed, and for such other relief as she may be entitled;

(c)        her litigation expenses and costs, including but not limited to her attorneys' fees and costs and any applicable expert fees, against ETAMU;

(d)        costs of court, pre-judgment and post-judgment interest, at the maximum rate as allowed by law against ETAMU; and

(d)        such other and further relief, both general and special, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
FRANK HILL
Texas Bar No. 09632000
fhill@hillgilstrap.com
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(817) 261-2222

STEFANIE M. KLEIN
Texas Bar No. 11565650
sklein@hillgilstrap.com
OF COUNSEL TO HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013
(469) 348-4070

**COUNSEL FOR PLAINTIFF
MEIFANG XIANG**